## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Brittany R. Tovar and,<br>Reid Olson, | Civil No. 16-100 (DWF/LIB) |
| Plaintiffs, | **MEMORANDUM<br>OPINION AND ORDER** |
| v. | |
| Essentia Health; Innovis Health, LLC,<br>d/b/a Essentia Health West;<br>HealthPartners, Inc.; and<br>HealthPartners Administrators, Inc., | |
| Defendants. | |

---

Christy L. Hall, Esq., Gender Justice, counsel for Plaintiffs.

Lisa Edison-Smith, Esq., and Vanessa L. Lystad, Esq., Vogel Law Firm, counsel for Defendants Essentia Health, and Innovis Health, LLC, d/b/a Essentia Health West.

David M. Wilk, Esq., Larson King LLP, counsel for Defendants HealthPartners, Inc., and HealthPartners Administrators, Inc.

---

## INTRODUCTION

Plaintiffs Brittany Tovar and Reid Olson brought this suit alleging that Defendants designed and sponsored a health care plan that contained a discriminatory categorical exclusion for all health services related to gender transition, and denied Olson, Tovar's transgender son, coverage for medically necessary care. HealthPartners and Essentia have both moved to dismiss the complaint. For the reasons discussed below, the Court grants in part and denies in part HealthPartners' motion and denies Essentia's motion.

**BACKGROUND**

Plaintiff Brittany Tovar was a nurse practitioner employed by Defendants Essentia Health and Innovis Health, LLC, d/b/a Essentia Health West (collectively, "Essentia"), from September 24, 2010, until July 29, 2016. (Doc. No. 66 ("Am. Compl.") ¶ 16.) As part of her employee benefits, Tovar was provided health insurance through the Essentia Health Employee Medical Plan (the "Plan"), which is sponsored by Essentia and administered by Defendants HealthPartners, Inc., and HealthPartners Administrators, Inc. (collectively, "HealthPartners," and collectively with Essentia, "Defendants"). (*Id.* ¶¶ 17, 25.) On October 1, 2014, Tovar's son, Plaintiff Reid Olson, became a beneficiary under the Plan. (*Id.* ¶ 18.)

In November 2014, Olson was diagnosed with gender dysphoria, which arises when an individual's gender identity differs from the gender assigned at birth.[1] (*Id.* ¶ 19.) According to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), the symptoms of gender dysphoria include "clinically significant distress or impairment in social, occupational, or other important areas of functioning." (*Id.* ¶ 21.) Medical treatments such as mental health counseling, hormone therapy, and gender reassignment surgery have been shown to relieve the symptoms of gender dysphoria. (*Id.* ¶ 22.) Health professionals decided that these treatments were necessary to treat Olson's gender dysphoria. (*Id.* ¶ 34.) Olson's doctor also recommended that

---

[1] The Court will refer to Olson with he/him pronouns consistent with Plaintiffs' pleadings and representations at the hearing on the motions to dismiss. (*See, e.g.*, Am. Compl. ¶ 23.)

Olson begin taking the medications Lupron and Androderm to treat Olson's gender dysphoria. (*Id.* ¶¶ 43-51, 63-67.)

Tovar and Olson sought coverage for these medical treatments as well as pre-authorization for gender reassignment surgery for Olson through the Plan, but because the Plan at that time categorically excluded coverage of "[s]ervices and/or surgery for gender reassignment," Defendants denied insurance coverage for Olson's treatment and medications. (*Id.* ¶¶ 23, 33-34, 68.) Tovar appealed the Plan's categorical exclusion of gender reassignment treatments. (*Id.* ¶¶ 36-41.) HealthPartners denied Tovar's appeal, notifying Tovar of its intent to enforce the terms of the Plan. (*Id.*) Tovar incurred out-of-pocket expenses for Androderm, but Plaintiffs decided not to purchase Lupron. (*Id.* ¶¶ 62, 66.) Defendants later decided to provide coverage for Androderm as a one-time exception and reimbursed Tovar for her out-of-pocket expenses. (*Id.* ¶ 67.) As a result of the denied coverage, Olson and Tovar suffered emotional and financial harm, and Olson suffered delayed access to medically necessary treatment. (*Id.* ¶¶ 70-72.)

Essentia requested that HealthPartners remove the exclusion from the Plan starting on January 1, 2016, and HealthPartners did so. (*Id.* ¶ 73.) On July 29, 2016, Tovar's employment with Essentia ended. (*Id.* ¶ 16.) Tovar and Olson, however, remained covered under the Plan through October 31, 2016. (*Id.* ¶ 73.)

In the First Amended Complaint, Plaintiffs have brought identical claims against HealthPartners alleging a violation of Section 1557 of the Patient Protection and

3

Affordable Care Act ("Section 1557"). Olson also brings a Section 1557 claim against Essentia. Essentia and HealthPartners separately move to dismiss.

## DISCUSSION

### I. Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court deciding a motion to dismiss may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id*. at 555. As the Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S.

4

at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## II. Section 1557

### A. Gender-Identity Discrimination

Tovar and Olson claim Defendants violated Section 1557, discriminating against Olson by designing, providing, and enforcing the Plan that contained a "discriminatory exclusion of any '[s]ervices and/or surgery for gender reassignment.'" (*Id.* ¶¶ 76, 80.) Defendants assert that Section 1557 does not provide protection against gender identity discrimination, and that consequently, Plaintiffs' claims must be dismissed.

Section 1557 prohibits discrimination and the denial of benefits on the basis of race, color, national origin, sex, age, or disability "under any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Section 1557 expressly incorporates four federal civil rights statutes, which outline the protected grounds of discrimination: race, color, and national origin (under Title VI); sex (under Title IX); age (under the ADEA); and disability (under the Rehabilitation act). *Id.*; *see also Se. Pa. Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 696 (E.D. Pa. 2015) (holding that the standard and burden of proof for a discrimination claim under Section 1557 changes depending upon the type of discrimination alleged and should be drawn from the relevant statute listed in 42 U.S.C. § 18116(a)). Accordingly, a plaintiff bringing a Section 1557 claim must essentially plead a corresponding civil rights statute predicate.

5

Here, Plaintiffs allege discrimination on the basis of Olson's gender identity. The question therefore is whether Title IX's prohibition against sex discrimination protects against discrimination based on gender identity. *See* 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex . . . be denied the benefits of, or be subjected to discrimination . . . ."). Although Title VII is not expressly incorporated into Section 1557, courts oftentimes look to Title VII when construing Title IX. *See, e.g.*, *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1047 (7th Cir. 2017).

In *Price Waterhouse v. Hopkins*, a plurality of the United States Supreme Court found that sex stereotyping is a form of sex discrimination. 490 U.S. 228, 251 (1989). There, the plaintiff alleged that her employer had discriminated against her for being too masculine, in violation of Title VII. *Id.* The Supreme Court affirmed this expansive view of Title VII in *Oncale v. Sundowner Offshore Services, Inc.*, in which the court stated that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." 523 U.S. 75, 79 (1998).

"By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker*, 858 F.3d at 1048; *see also Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes."). Courts have therefore recognized a cause of action under Title VII for sex discrimination based on gender identity and gender-transition status, *e.g.*, male-to-female, female-to-male. *See E.E.O.C. v. R.G. & G.R. Harris Funeral Homes,*

6

*Inc.*, 884 F.3d 560, 572 (6th Cir. 2018); *Chavez v. Credit Nation Auto Sales, LLC*, 641 Fed. App'x 883 (11th Cir. 2016); *E.E.O.C. v. Rent-A-Center East, Inc.*, 264 F. Supp. 3d 952, 956 (C.D. Ill. 2017). Courts have also recognized a cause of action under Title IX for discrimination against individuals who are perceived as not conforming to gender stereotypes. *See Miles v. New York Univ.*, 979 F. Supp. 248, 250 n.4 (S.D.N.Y. 1997); *Kastl v. Maricopa Cty. Cmty. Coll. Dist.*, Civ. No. 02-1531, 2004 WL 2008954, at *2 (D. Ariz. June 3, 2004). Finally, numerous courts that have had the occasion to consider the precise question at issue here have held that Section 1557's nondiscrimination requirements encompass gender-identity discrimination. *See, e.g.*, *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1098-1100 (S.D. Cal. 2017) (holding that Section 1557 extends to claims of gender identity based on its plain language); *Flack v. Wis. Dep't of Health Servs.*, Civ. No. 18-309, 2018 WL 3574875, at *12-13 (W.D. Wis. July 25, 2018); *Rumble v. Fairview Health Servs.*, Civ. No. 14-2037, 2017 WL 401940, at *3 (D. Minn. Jan. 30, 2017). The Court finds the reasoning of the foregoing cases persuasive. Because Title VII, and by extension Title IX, recognize that sex discrimination encompasses gender-identity discrimination, the Court concludes that Section 1557 also prohibits discrimination on the basis of gender identity.

  **B.** **Spending Clause Notice Requirement**

  Defendants argue that even if Section 1557 prohibits gender-identity discrimination, the claims against them must fail because they did not have notice that, by accepting federal funding, they assumed specific liabilities. Specifically, Defendants argue that "because Section 1557 incorporates Title IX and Title IX was enacted as an

7

exercise of Congress' power under the Spending Clause, recipients of federal funds must have adequate notice of circumstances that may subject them to liability under the statute." (Doc. No. 86 at 3 (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999)).) Defendants further argue that they did not have notice that Section 1557 prohibited gender-identity discrimination until the U.S. Department of Health and Human Services ("DHHS") issued the final agency rule concerning Section 1557's nondiscrimination requirements. (Doc. No. 86 at 4.) The Court disagrees. Congress passed the Patient Protection and Affordable Care Act in 2010, and Section 1557 has been in effect since that time. The plain language of Section 1557 incorporates Title IX and its prohibition on sex discrimination. By way of the reasoning and holdings set forth in cases such as *Price Waterhouse* and *Oncale*, Defendants were on notice that Section 1557's nondiscrimination requirements encompassed gender-identity discrimination.

### C. Title IX Notice and Deliberate Indifference

Finally, Defendants argue that because Section 1557 incorporates Title IX, a plaintiff alleging discrimination may not recover damages unless the defendant had actual notice and was deliberately indifferent to the alleged misconduct. *See Gebser v. Lago Vista Ind. Sch. Distr.*, 524 U.S. 274, 288 (1998); *Grandson v. Univ. of Minn.*, 272 F.3d 568, 571 (8th Cir. 2001) ("[T]he express remedy in Title IX operates on an assumption of prior notice of alleged discrimination to the funding recipient and an opportunity to rectify any violation voluntarily."). Defendants argue that Plaintiffs' claims fail because

8

they did not provide Defendants notice and an opportunity to remedy the Plan's alleged discrimination against transgender individuals.

Plaintiffs allege that the Plan was facially discriminatory, and therefore, Defendants had actual notice that the Plan violated Section 1557's nondiscrimination requirements. The Court agrees. A facially discriminatory health-insurance plan is different than teacher-student sexual harassment, *see generally Gebser*, 524 U.S. at 288, or funding issues relating to men's and women's intercollegiate athletics, *see Grandson*, 272 F.3d at 571. Here, Plaintiffs have alleged sufficient facts demonstrating that Defendants knew of the discriminatory exclusion in the Plan that Defendants designed, provided, and administered.

### III. Third-Party Administrator

HealthPartners also argues that the claim against it fails because, as a third-party administrator ("TPA"), it cannot be held liable for administering the Plan whose allegedly discriminatory terms were under the sole control of Essentia. HealthPartners cites to ERISA statutes and caselaw establishing that a TPA "is required to administer a self-insured health plan according to its terms." (Doc. No. 75 at 17 (citing *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 934 n.6 (8th Cir. 2015); *Dordt Coll. v. Burwell*, 801 F.3d 946, 947 n.2 (8th Cir. 2015)).) According to HealthPartners, because Plaintiffs did not allege that HealthPartners had the authority to change the Plan, Plaintiffs have failed to state a plausible Section 1557 claim.

Contrary to HealthPartners' argument, ERISA specifically carves out room for TPAs to comply with other federal laws: "Nothing in this subchapter shall be construed

to alter, amend, modify, invalidate, impair, or supersede any law of the United States." 29 U.S.C. § 1144(d). The Court will not construe ERISA to impair Section 1557. Nothing in Section 1557, explicitly or implicitly, suggests that TPAs are exempt from the statute's nondiscrimination requirements. Accordingly, the Court concludes that HealthPartners may be held liable under Section 1557.

## IV. Standing

### A. Article III Standing

The Court next considers whether Tovar has standing to pursue her claim against HealthPartners. "[A] plaintiff seeking relief in federal court must first demonstrate that he has standing to do so, including that he has 'a personal stake in the outcome,' distinct from a 'generally available grievance about government.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018) (citations omitted). The purpose of this requirement is to ensure that courts "do not engage in policymaking properly left to elected representatives." *Id.* (citation omitted). To demonstrate standing to invoke federal court jurisdiction under Article III of the Constitution, a plaintiff must establish: "that he '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* at 1929 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

The Supreme Court recently affirmed that "injury in fact" is "[f]oremost among these requirements." *Id.* The injury in fact element requires a plaintiff to "show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*,

136 S. Ct. at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Where a plaintiff seeks injunctive relief, he must adequately establish the threat of such an injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). A "concrete" injury is one that "actually exist[s]," although it may be intangible. *Spokeo*, 136 S. Ct. at 1548-49. While "Congress may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law," a plaintiff does not automatically establish an injury in fact "whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 1549 (quoting *Lujan*, 504 U.S. at 578 (quotations marks and brackets omitted)). "Where . . . a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element," and it is the plaintiff's burden to establish standing. *Id.* at 1547.

HealthPartners argues that Tovar lacks standing to assert her claim. Specifically, HealthPartners argues that Tovar has suffered no cognizable injury in fact because she has no unreimbursed out-of-pocket expenses and may not seek damages based on her own emotional distress caused by a deprivation of Olson's civil rights. (Doc. No. 75 at 12.) HealthPartners relies on the Eighth Circuit's prior opinion in this case, in which the Court found a potential injury to Tovar based on unreimbursed out-of-pocket expenses:

> We conclude that Tovar has alleged an injury cognizable under Article III because she contends that the defendants' discriminatory conduct denied her the benefits of her insurance policy and forced her to pay out of pocket for some of her son's prescribed medication. The record is silent on whether Tovar has been fully reimbursed for these out of pocket payments .
> . . .

*Tovar v. Essentia Health*, 857 F.3d 771, 778-79 (8th Cir. 2017).

11

Plaintiffs argue that HealthPartners' argument relies on an "over-interpretation of the 8th Circuit's statement" and that the standing question does not "hinge[] on reimbursement alone." (Doc. No. 85 at 5.) The Eighth Circuit's decision, according to Plaintiffs, also pointed to Tovar being denied the benefit of her insurance policy as a separate injury. *See Tovar*, 857 F.3d at 778-79. In addition, Plaintiffs claim that Tovar suffered injuries in the form of wasted time communicating with Defendants regarding the Plan's exclusion, financial harm and stress relating to the reimbursed out-of-pocket expenses, and emotional stress relating to the dangers that Olson faced while being discriminated on the basis of his gender identity. (Doc. No. 85 at 5-6.)

The Court finds that Tovar's only cognizable injuries in fact, *i.e.*, her out-of-pocket expenses, have been redressed. Tovar's remaining injuries are non-economic and related to her emotional distress. Although Tovar undoubtedly suffered emotional harm relating to her efforts to secure medically necessary treatment for her son, emotional harm is not sufficient to convey standing for a parent to seek damages caused by a violation of a child's civil rights. *See Helleloid v. Indep. Sch. Dist. No. 361*, 149 F. Supp. 2d 863, 877 (D. Minn. 2001) (holding parents do not have standing to non-economic damages caused by deprivation of child's rights); *Pierzynowski v. Police Dep't City of Detroit*, 941 F. Supp. 633, 640 (E.D. Mich. 1996) (holding same and noting that allowing family member claims would "open the floodgates" of litigation). Tovar fiercely and effectively advocated for her son through the claims and appeals process, but her non-economic injuries do not provide her standing to remain in this case.

The Court observes that this is the correct legal result – but not the fair and just one.

For the foregoing reasons, the Court determines that Tovar lacks Article III standing and this Court therefore lacks jurisdiction to consider her claim against HealthPartners. The Court therefore grants HealthPartners' Motion to Dismiss to the extent it seeks dismissal of Tovar's Section 1557 claim. Olson, however, has Article III standing to pursue his claim against HealthPartners.

**B.    Statutory Standing**

HealthPartners also states that Olson lacks statutory standing because he is not within the class of plaintiffs authorized to bring suit under Section 1557.[2] The United States Supreme Court has framed the statutory standing question as one focused on "the scope of the private remedy created by Congress." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). Under *Lexmark*, the first inquiry is whether the plaintiffs' interests "fall within the zone of interests protected by the law invoked." *Id.* at 129 (internal quotation marks and citation omitted). The Supreme Court has made clear that the zone-of-interests test is lenient, and "that the test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* at 130 (internal quotation marks and citation omitted). The second inquiry is whether the plaintiffs' injuries are proximately caused by

---

[2]    HealthPartners also argues that Tovar is not within the class of plaintiffs authorized to bring suit under Section 1557. Because the Court has concluded that Tovar lacks Article III standing, the Court does not need to decide whether Tovar has statutory standing.

13

violations of the statute. *Id.* at 132. The proximate-cause inquiry considers "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at 133.

Here, Section 1557 incorporates anti-discrimination provisions, like Title IX, that are intended to end discrimination. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005) (noting the Supreme Court's "repeated holdings construing 'discrimination' under Title IX broadly"). Section 1557 expressly forbids that anyone, "on the ground [of sex] . . . be denied the benefits of . . . any health program or activity." 42 U.S.C. § 18116. Olson has an interest in being treated equally and not discriminated against on account of his gender identity. The Court concludes that Olson's interest therefore falls within the zone of interests meant to be protected by Section 1557. The Court also finds that the harm that Olson suffered, *i.e.*, being denied access and receiving delayed access to medically necessary care, was proximately caused by HealthPartners' designing and providing to Essentia the discriminatory provisions in the Plan. The Court therefore concludes that Olson has statutory standing to bring his Section 1557 claims.

V.   **Motion to Stay**

Both Essentia and HealthPartners ask the Court to stay this action pending resolution of *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 695 (N.D. Tex. 2016). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "A district court has broad discretion to stay proceedings when appropriate to

14

control its docket." *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 816 (8th Cir. 2006). In considering whether to stay proceedings, the Court considers relevant factors, including the conservation of judicial resources, maintaining control of the court's docket, providing for the just determination of cases, as well as the potential for duplicative efforts and wasted resources of the parties and hardship to the party opposing the stay. *Edens v. Volkswagen Grp. of Am., Inc.*, Civ. No. 16-0750, 2016 WL 3004629, at *1-2 (D. Minn. May 24, 2016) (citations omitted). The party requesting a stay bears the burden of establishing the need for a stay. *Id.*

In *Franciscan Alliance*, the District Court for the Northern District of Texas issued a nationwide injunction enjoining enforcement of the DHHS rule providing, in relevant part, that Section 1557's prohibition of discrimination on the basis of sex encompasses gender identity. *Id.*; *see also* 45 C.F.R. § 92.207(b)(4), 92.4. The *Franciscan Alliance* court concluded that the regulations exceeded DHHS's authority and therefore violated the Administrative Procedures Act. *Franciscan Alliance*, 227 F. Supp. 3d at 695. DHHS has since indicated that it is reevaluating the regulations and anticipates the submission of a new proposed rule. *See Franciscan Alliance, Inc. v. Price*, 2017 WL 3616652, at *3, 5 (N.D. Tex. July 10, 2017).

Essentia also points to *Rumble*, in which Judge Nelson stayed the plaintiff's Section 1557 action. 2017 WL 401940, at *3-4. Although *Rumble* cited *Franciscan Alliance*, the decision primarily relied on then-pending *Gloucester Cty. Sch. Bd. v. G.G.*, 137 S. Ct. 369 (2016), in which the Supreme Court considered whether a school's bathroom policy segregating transgender students violated Title IX's prohibition of sex

15

discrimination. *See Rumble*, 2017 WL 401940, at *4. The Supreme Court has since remanded *Gloucester County* to the Fourth Circuit Court of Appeals without resolving the merits of the case. *Gloucester Cty.*, 137 S. Ct. at 1239.

Having considered the parties' arguments, the relevant factors, and based on the circumstances of the present case, the Court determines that a stay is not warranted. Here, the Court's conclusion that Section 1557 prohibits discrimination based on gender identity relies solely on the plain, unambiguous language of the statute. The Court does not base its decision on the constitutionality of the DHHS regulation at issue in *Franciscan Alliance*. The ultimate resolution of *Franciscan Alliance* and any potential, new proposed DHHS regulation will not affect the resolution of this matter. The Court therefore concludes that Defendants have not met their burden as the moving party in demonstrating a need for a stay and denies Defendants' requests to stay this action.

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants HealthPartners, Inc., and HealthPartners Administrators, Inc.'s Motion to Dismiss and to Stay Discovery (Doc. No. [73]) is **GRANTED** insofar as it seeks dismissal of Plaintiff Brittany R. Tovar's claim and is **DENIED** in all other respects.

2. Defendants Essentia Health and Innovis Health, LLC's Motion to Dismiss, or in the alternative, Motion to Stay (Doc. No. [78]) is **DENIED**.

3. Insofar as Count I of the First Amended Complaint is brought by Plaintiff Brittany R. Tovar, Count I is **DISMISSED WITH PREJUDICE**. Plaintiff Reid Olson's claim against Defendants HealthPartners, Inc., and HealthPartners Administrators, Inc. remains.

Dated: September 20, 2018        <u>s/Donovan W. Frank</u>
                                              DONOVAN W. FRANK
                                              United States District Judge